IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF TEXAS

HOUSTON DIVISION

| RUTHA CARROLL, et al. | § | |
|---|---|---|
| | § | |
| | § | |
| | § | |
| VS. | § | CIVIL ACTION NO. H-08-2970 |
| | § | |
| | § | |
| HARRIS COUNTY, TEXAS, et al. | § | |

## REPORT AND RECOMMENDATION

Before the Court, by referral from the Honorable Gray H. Miller, United States District Judge, is Defendant TASER International, Inc.'s Motion for Summary Judgment. (Docket Entry ("Dkt.") No. 75). Plaintiffs filed a response seeking voluntary dismissal of their claims against TASER (*see* Dkt. No. 88 at ¶ III), to which Defendant filed a Response. (Dkt. No. 96). Having carefully considered Defendant TASER International's Motion, Plaintiffs' request for voluntary dismissal, TASER's response, the numerous exhibits, and the applicable law, the Court submits this Report and Recommendation to the District Court.

## I. BACKGROUND

This action was brought by the survivors[1] (hereinafter, collectively referred to as "Plaintiffs") of Herman Rochan Carroll, a.k.a. Herman Rochan Barnes, (hereinafter, "Barnes"

---

[1] The following persons brought this suit: Rutha Carroll and Herman Carroll, Sr., individually and as heirs [surviving parents] of Decedent; Chastity Rodgers, on behalf of the Estate of Decedent; and Tameisha Jones, as next friend of Jada Knox and Maya Barnes, minor children of the Decedent. (Dkt. No. 1 at 2).

1

or "Decedent") against Defendants Harris County, Texas, Harris County Sheriff Tommy Thomas, numerous deputies, and TASER International, Inc. ("TASER").

For purposes of this Report and Recommendation,[2] only a brief summary of the facts is necessary. On October 6, 2006, Barnes was outside of his home when Harris County Deputy Andy Viruette, Jr., drove past the house. Deputy Viruette turned the squad car around, parked it outside of Barnes' house, and proceeded to ask Barnes questions. When Barnes turned to walk back inside his home, the deputy ordered Barnes to stop and ran after him. The deputy followed Barnes into the house. A witness claims to have heard Barnes telling Deputy Viruette to leave his house, but the deputy would not leave. After entering the house, Deputy Viruette, in an attempt to arrest and restrain Barnes, began using force against him which included, but was not limited to, tasering him. Other deputies were called to the scene and, upon arrival, they also entered the house. In an effort to restrain Barnes, several of the officers employed force against Barnes, which included tasering him using the dart probe mode and the drive-stun mode.

Emergency Medical Services ("EMS") was called to the scene and was initially directed to assist two deputies with their hand injuries. After spending time treating the deputies, EMS personnel learned that Barnes was also injured. Upon entering the house, EMS found Barnes on the floor, restrained by handcuffs and leg restraints, and unconscious. EMS requested that the deputies remove the handcuffs from Barnes so they could treat him. EMS made several attempts to intubate Barnes on the scene, but their efforts proved unsuccessful. Another EMS team arrived at the scene. Barnes was transported from his house to the hospital, however, at the time of

---

[2] While the other defendants have filed Motions for Summary Judgment, this Court's Report and Recommendation is limited to TASER's Motion.

transport, he was unconscious, non-responsive; he had no pulse, blood pressure or respiration and was in cardiac arrest. Barnes was admitted to the hospital where he was later pronounced dead.

An autopsy was conducted by the Harris County medical examiner's office. The autopsy report detailed several abrasions, of various sizes, to different areas of Barnes' face; puncture wounds and/or superficial lacerations to his neck, mid-chest, upper right shoulder, medial regions of his back; and injuries to his tongue and buttocks. The report also detailed the examiner's finding that Barnes had been tasered multiple times—a finding which was consistent with the incident report which reflected that deputies either attempted to taser or tasered Barnes more than thirty times. (Dkt. No. 75, Vol. VI, Tab L at 198 ("Trigger Pull Records from Incident" which reflects that tasers were deployed, in one of the modes previously specified, indicated 7 times by Deputy Viruette, 2 times by Deputy Evans, and 23 times by Deputy Ellington)). The medical examiner found no evidence of either drugs or alcohol in Barnes' blood, but he did note that Barnes was reported to have a history of mental illness. The medical examiner's report notes the "Cause of Death" as "Sudden death during schizophrenic psychotic delirium following physical restraint." (Dkt. No. 75, Vol. I, Tab B at 4). In his report, the medical examiner explained:

> [t]he mechanism of death in this case is likely related to automatic stimulation during this psychotic episode. The manner of death derives from the events leading up to the death; the actions of others, regardless of intent, clearly exacerbated the psychotic delirium. Therefore, but for the actions of others, it is unlikely this man would have died at the time he did. The manner of death will be listed as homicide.

(*Id.* at 7).

On October 6, 2008, Plaintiffs filed this § 1983 action against Defendants in federal court. (Dkt. No. 1). Plaintiffs allege that TASER, as the manufacturer of the TASER X26 system, placed

3

"in commerce a product that failed in its intended purpose, to-wit: advertised as a "less-lethal weapon." (Dkt. No. 1 at 19, ¶ 48). Plaintiffs further allege that how TASER markets the device "lulls officers into a false sense of safety and causes the multiple and repeated use of the product." (*Id.* at ¶ 49).

On January 7, 2011, TASER International filed a Motion for Summary Judgment seeking dismissal of all Plaintiffs' claims against it. (Dkt. No. 75). TASER also filed *Daubert* motions with respect to two of Plaintiffs' expert witnesses. (Dkt. Nos. 76 & 77). While Plaintiffs filed a collective response to all the summary judgment motions that had been filed, as to Defendant TASER, Plaintiffs responded by stating that they "were electing to voluntary stipulate the dismissal of the TASER; thus no response is submitted with respect to this Defendant's Motion for Summary Judgment or motions to strike." (Dkt. No. 88 at ¶ III). Defendant TASER filed a response to Plaintiffs request for voluntary dismissal urging that the Court deny voluntary dismissal or, if granted, to do so only with prejudice. (Dkt. No. 96). TASER's Motion for Summary Judgment and its *Daubert* motions are now ripe for adjudication.

## II. STANDARD OF REVIEW

The Court analyzes Defendant TASER's Motion under the well-established summary judgment standard. Fed. R. Civ. P. 56(c); *see generally, Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 576, 586-87 (1986); *Burge v. Parish of St. Tammany*, 187 F.3d 452, 464 (5th Cir. 1999); *United States v. Arron*, 954 F.2d 249, 251 (5th Cir. 1992).

## III. DISCUSSION

TASER brings this motion seeking summary judgment as to Plaintiffs' claim against it. In particular, TASER claims that the only claim against it—an alleged marketing defect (failure to warn)—fails because the undisputed evidence establishes that TASER issued adequate warnings or instructions and because causation is lacking. (Dkt. No. 75 at 2).

In Texas, § 402A of the Restatement (Second) of Torts governs strict liability claims. *Am. Tobacco Co. v. Grinnell*, 951 S.W.2d 420, 426 (Tex.1997); *Borel v. Fibreboard Paper Prod. Corp.*, 493 F.2d 1076, 1087 (5th Cir. 1973). Under § 402A(1), a "defective" product is one that is "unreasonably dangerous to the user or consumer." Restatement (Second) of Torts § 402A(1) (1965); *Borel*, 493 F.2d at 1087; *Sims v. Washex Mach. Corp.*, 932 S.W.2d 559, 561 (Tex.App.–Houston [1st Dist.] 1995, no writ). A plaintiff may prove that a product is "defective" in either its design, manufacture or marketing. *Grinnell*, 951 S.W.2d at 426; *Sims*, 932 S.W.2d at 561–62; *see also, Helicoid Gage Div. of Am. Chain & Cable Co. v. Howell*, 511 S.W.2d 573, 575 (Tex.Civ.App.--Houston [14th Dist.] 1974, writ ref'd n.r.e.) (explaining that plaintiff must prove that product defective in at least one way).

In the present case, based on their pleadings, Plaintiffs' claim against TASER is limited to a marketing defect claim sounding in strict liability.[3] To prevail on a marketing defect claim, a plaintiff must prove that the defendant knew or should have known of a potential risk of harm presented by the product, but marketed it without adequately warning of the danger or providing

---

[3] The Court notes that Plaintiffs' expert, Jahan Rasty, opined that the taser was defectively designed (Dkt. No. 77, Vol. II, App. Tab D at 51), however, a careful review of Plaintiffs' Complaint reflects that they never alleged that the taser was defectively designed nor did they ever seek to amend their complaint, given their expert's opinion, to include this claim.

5

instructions for its safe use. *See Bristol-Myers Co. v. Gonzales*, 561 S.W.2d 801, 804 (Tex.1978); *Ethicon Endo-Surgery, Inc. v. Meyer*, 249 S.W.3d 513, 516 (Tex.App.-Fort Worth 2007, no writ). To establish a theory of recovery based on marketing defect, a claimant must prove the following: (1) a risk of harm is inherent in the product or may arise from the intended or reasonably anticipated use of the product; (2) the product supplier actually knew or should have reasonably foreseen the risk of harm at the time the product was marketed; (3) the product contains a marketing defect; (4) the absence of a warning and/or instructions renders the product unreasonably dangerous to the ultimate user or consumer of the product; and (5) the failure to warn and/or instruct constitutes a causative nexus in the product user's injury. *USX Corp. v. Salinas*, 818 S.W.2d 473, 483 (Tex.App.-San Antonio, 1991, writ denied).

While the existence of a duty to warn or instruct presents a question of law (*see McLennan v. American Eurocopter Corp.*, 245 F.3d 403, 428 (5th Cir. 2001), under Texas law, generally the adequacy of a warning is a question of fact to be determined by the jury. *Alm v. Aluminum Co. of America*, 717 S.W.2d 588, 591-92 (Tex. 1986); *see also, Koonce v. Quaker Safety Prods.*, 798 F.2d 700, 716 (5th Cir.1986) (recognizing "[w]hether a product supplier must provide a warning or instruction in light of the user's expertise is generally a question for the jury."); *Brumley v. Pfizer Inc.*, 149 F.Supp.2d 305, 309 (S.D. Tex. 2001) (same); *Williams v. Upjohn Co.*, 153 F.R.D. 110, 114 (S.D.Tex.1994) (same). Nevertheless, courts have acknowledged that a claim of inadequate warning does not always present a jury issue. *See Stahl v. Novartis Pharmaceuticals Corp.*, 283 F.3d 254, 264 (5th Cir. 2002). If, for example, "a warning specifically mentions the circumstances complained of, the warning is adequate as a matter of law." *Rolen v. Burroughs Wellcome Co.*, 856 S.W.2d 607, 609 (Tex.App.-1993); *see also, Gerber v. Hoffman-La Roche*

6

*Inc.*, 392 F.Supp.2d 907, 916 (S.D.Tex. 2005) (same); *Wyeth Ayerst Lab. Co. v. Medrano*, 28 S.W.3d 87, 95 n. 6 (Tex.App.–Texarkana 2000) (same); *McNeil v. Wyeth*, 2005 WL 544222, *4, *6 (N.D.Tex. Mar.4, 2005) (same); *Brumley*, 149 F.Supp.2d at 310 (same); *see generally, Stahl*, 283 F.3d at 267 (the warning must "contain language that is adequate to reasonably inform the [user] . . . about the nature of the danger involved.").

The undisputed evidence submitted in this case reflects that TASER specifically warned of risks associated with the multiple applications of the TASER X26™ Electronic Control Device ("ECD"). Here, in addition to the Training DVD and Operating Manual packaged with each ECD, Taser sent the Harris County Sheriff's Office a hard copy of its most current product warnings dated August 28, 2006. (Dkt. No. 75, Vol VII, Ex. O, p. 223). These warnings expressly stated:

> TASER® electronic devices are weapons designed to incapacitate a person from a safe distance while reducing the likelihood of serious injuries or death. Though they have been found to be a safer and more effective alternative when used as directed to other traditional use of force tools and techniques, it is important to remember that the very nature of use of force and physical incapacitation involves a degree of risk that someone will get hurt or may even be killed due to physical exertion, unforeseen circumstances and individual susceptibilities.

In addition, under the heading "**DEPLOYMENT WARNINGS**," the following warnings were directed to officers using tasers as "**Deployment Safety Procedures**":

> **Reload and Deploy**. If a TASER device application is ineffective in achieving the desired result, consider reloading or redeploying or using other force option(s), according to approved training and policy.
>
> \* \* \*

> **Control and Restrain Immediately.** Begin control and restraint procedures as soon as it is reasonably safe to do so in order to minimize the total duration of exertion and stress experienced by the subject.

Also contained in the same product warnings, under the heading **"Deployment Health Risks,"**

TASER warned officers of the following:

> **Sudden In-Custody Death Syndrome Awareness.** If a subject is exhibiting signs or behaviors[2] that are associated with Sudden In-Custody Death Syndrome,[3] consider combining use of a TASER device with immediate physical restraint techniques and medical assistance.
>
>> Fn 2. Signs of Sudden In-Custody Death Syndrome include: extreme agitation, bizarre behavior, inappropriate nudity, imperviousness to pain, paranoia, exhaustive exertion, "superhuman" strength, hallucinations, sweating profusely, etc.
>>
>> Fn 3. Sudden in-custody death results from a complex set of physiological and psychological conditions characterized by irrational behavior, extreme exertion, and potentially fatal changes in blood chemistry. Promptly capturing, controlling, and restraining a subject exhibiting signs of these conditions may end the struggle and allow early medical care intervention.
>
> **Continuous Exposure Risks.** When practical, avoid prolonged or continuous exposure(s) to the TASER device's electrical discharge. In some circumstances, in susceptible people, it is conceivable that the stress and exertion of extensive repeated, prolonged, or continuous application(s) of the TASER device may contribute to cumulative exhaustion, stress, and associated medical risk(s).
>
> **Other Conditions.** Unrelated to TASER exposure, conditions such as excited delirium, severe exhaustion, drug intoxication or chronic drug abuse, and/or over-exertion from physical struggle may result in serious injury or death.
>
> **Breathing Impairment.** Extended or repeated TASER device exposures should be avoided where practical. . . . Accordingly, it is advisable to use expedient physical restraint in conjunction with the TASER device to minimize the overall duration of stress, exertion, and potential breathing impairment particularly on individuals exhibiting symptoms of excited delirium and/or exhaustion.

8

\* \* \*

> **Seizure Risks.** Repetitive stimuli such as flashing lights or electrical stimulation can induce seizures in some individuals. This risk is heightened if electrical stimulation or current passes through the head region.

(Dkt. No. 75, VII, Tab O).

The Court finds that TASER's warnings were adequate, as a matter of law, to warn of the circumstances of this case. In particular, TASER warned officers that the use of the taser involves physical incapacitation and that "it is important to remember that the very nature of use of force and physical incapacitation involves a degree of risk that someone will get hurt or may even be killed due to physical exertion, unforeseen circumstances and individual susceptibilities." (Dkt. No. 75, Vol. VII , Tab O). TASER further warned that "prolonged or continuous" exposure should be avoided because, in susceptible people the stress and exertion of repeated applications could contribute to exhaustion, stress and associated medical risks. TASER warned that susceptible people could include those who exhibited signs of excited delirium, severe exhaustion, drug intoxication or chronic drug abuse, and/or over-exertion from physical struggle; and further warned that increased exhaustion or stress in these individuals may result in serious injury or death. Given the adequacy of TASER's warnings, all of which were provided to the Harris County Sheriff's Office before the incident in question, Plaintiffs' claim of a marketing defect (failure to warn) fails. The Court, therefore, concludes that summary judgment for TASER is appropriate.[4]

---

[4] Because the Court finds that TASER's warnings were adequate as a matter of law, it need not decide whether Plaintiffs can show that the taser caused Barnes' death. Further, Defendant TASER's *Daubert* motions (Dkt. Nos. 76 & 77), in which they seek to strike Plaintiffs' experts on this issue of causation, are rendered moot and, therefore, should be denied.

## CONCLUSION

For the foregoing reasons, this Court **RECOMMENDS** that Defendant TASER International's Motion for Summary Judgment (Dkt. No. 75) be **GRANTED** and that Plaintiffs complaint against TASER be dismissed with prejudice.

The Court further **RECOMMENDS** that Defendant TASER's *Daubert* Motions (Dkt. Nos. 76 & 77) be **DENIED** as moot.

The Clerk **SHALL** send a copy of this Report and Recommendation to the Parties who **SHALL** have until June 13, 2011, to have written objections filed pursuant to 28 U.S.C. §636(b)(1)(C). Failure to file written objections within the prescribed time **SHALL** bar the Parties from attacking on appeal the factual findings and legal conclusions accepted by the District Judge, except upon grounds of plain error.

**DONE** at Galveston, Texas, this 25th day of May, 2011.

_____
JOHN R. FROESCHNER
UNITED STATES MAGISTRATE JUDGE